# THE STATE v. CLIFFORD WOODWARD, Appellant.

### Division Two, December 12, 1905.

1. **MURDER: Defective Information.** An information for murder which alleges that defendant "unlawfully, wilfully, feloniously, premeditatedly, on purpose and of his malice aforethought, did strike and beat" deceased, "at and upon the right side of the head of" deceased, "with the club aforesaid, and inflicting and giving to" deceased, "in and upon the right side of the head of" deceased, "one mortal wound," etc., is insufficient, in that it fails to allege that the homicidal act was done feloniously, and the wounding is in no way connected with the felonious assault by use of the words "then and there" or their equivalents.

2. **PRACTICE: Leading Questions.** The asking of leading questions in the examination of witnesses is a matter within the sound discretion of the trial court.

3. **REPUTATION OF DECEASED: Put in Issue by Defendant.** Where defendant, in the cross-examination of a witness for the State, undertook to elicit testimony reflecting on the reputation of deceased, it was not error to permit the State to rebut such testimony by evidence of his good reputation.

4. **EVIDENCE: Immaterial.** Evidence of conversations and acts between a brother of defendant and one of the witnesses, which took place in the absence of defendant, and which did not tend to prove or disprove any of the issues presented at the trial, should have been excluded.

5. **RES GESTAE.** Evidence tending to show that a brother of defendant, who was jointly indicted with him, had an open knife during the fatal difficulty, and that another witness, who was present at the difficulty, was cut on the knuckles, was admissible as a part of the *res gestae*.

6. **DEFENDANT AS WITNESS: Character.** When defendant testifies as a witness, it is competent for the State to attack his general moral character.

7. **PRIOR CONVICTION: How Shown.** When defendant testifies in his own behalf, evidence of his conviction of a previous offense may be shown for the purpose of affecting his credibility. But if defendant denies such previous conviction, it must be shown by competent evidence, that is, by the record of the court where such conviction was had.

8. **INSTRUCTION: Deliberation.** Where an instruction on murder in the second degree employs the terms "without deliberation," it is· proper to define such terms.

9. ————: **Evidence: Defense of Brother.** If there is · evidence tending to show that defendant was acting in defense of both himself and his brother, an instruction that he had the right to defend himself or his brother is not error.

10. **DRUNKENNESS: No Excuse for Crime.** Voluntary drunkenness furnishes no excuse or justification for the commission of crime.

Appeal from Pemiscot Circuit Court.—*Hon. Henry C. Riley,* Judge.

REVERSED AND REMANDED.

*Duncan & Bragg, J. S. Gossom* and *B. A. McKay* for appellant.

(1) The court should have sustained appellant's objection to the leading questions propounded to witness Curry. McKelvey, Ev., sec. 236; State v. Keith, 53 Mo. App. 383. (2) The court committed reversible error in permitting the State to prove the good reputation of the deceased when the defense had not put the reputation of deceased in issue by offering evidence of his bad reputation. McKelvey, Ev., sec. 120. The defense can only attack the reputation of deceased by showing his general character or reputation, which was never done in this case. Kelley's Criminal Law and Practice, sec. 249; State v. Elkins, 63 Mo. 159. (3) The court erred in permitting the State to show the bad reputation of defendant when he had not offered evidence of his good reputation. (4) It was error for the court to permit witness Bailey to testify to the conviction of defendant in his justice court of former offenses committed by defendant. This testimony should have been excluded, as it was not the proper way to prove conviction on a former charge and was greatly prejudicial to defendant. R. S. 1899, sec. 4680; State v.

Creason, 38 Mo. 372; 3 Greenleaf on Ev., sec. 25; State v. Kenney, 177 Mo. 117. (5) There was no testimony authorizing the instruction as to defense of defendant's brother. Defendant relied upon his own necessary self-defense as a defense in this cause, and at no time was there any testimony offered which would authorize the above instruction. This instruction was greatly prejudicial to appellant, as it diverted the minds of the jury from the real defense. State v. Thompson, 83 Mo. 260; State v. Degonia, 69 Mo. 485; State v. Tice, 90 Mo. 112; State v. Herrell, 97 Mo. 105. (6) The information is insufficient in law and does not charge an offense against this defendant, in this, to-wit, because the information does not charge the wounding and killing to have been felonious, wilful, premeditatedly and of malice aforethought. State v. Williams, 184 Mo. 261; State v. Rector, 126 Mo. 329; State v. Ferguson, 162 Mo. 673; State v. Green, 111 Mo. 585; State v. Fairlamb, 121 Mo. 154; State v. Clayton, 100 Mo. 516; State v. Herrell, 97 Mo. 105; State v. Feaster, 25 Mo. 324.

*Herbert S. Hadley,* Attorney-General, and *N. T. Gentry,* Assistant Attorney-General, for the State.

(1) The trial court, in the exercise of its discretion, had the right to allow the State's attorney to ask leading questions. State v. Napper, 141 Mo. 401; State v. Whalen, 148 Mo. 290. (2) Defendant insists that error occurred in permitting the State to prove the good reputation that deceased enjoyed as a peaceable and orderly man. Having opened up the subject and in this way attacked the general reputation of deceased, the State then had the right to prove that his reputation was good. (3) It was competent for the State to attack the reputation of defendant and his brother George for morality, as both of them had testified in this case. State v. Evans, 158 Mo. 609; State v. May,

142 Mo. 135. In cross-examining these character witnesses, the defendant brought out from them the fact that defendant and his brother had bad reputations for peace and good order. Certainly defendant cannot complain of evidence that he himself elicited. It was his privilege to descend into particularities, and he did so at his peril. State v. Hamey, 168 Mo. 197; State v. Palmer, 88 Mo. 572. (4) The information, which was duly verified, is sufficient in form and substance. The cases cited by appellant do not hold that this information is insufficient; in fact, they hold the contrary. State v. Williams, 184 Mo. 261; State v. Terry, 172 Mo. 213.

FOX, J.—This cause is here on appeal from a judgment of conviction in the circuit court of Pemiscot county of murder in the second degree. This prosecution is based upon an information filed by the prosecuting attorney of Pemiscot county charging George and Clifford Woodward with murder in the second degree. The correctness and validity of the information being challenged, it is well to reproduce it. It is as follows:

"In the circuit court of Pemiscot county, Missouri,
     To February term, 1904.
"State of Missouri, County of Pemiscot.  ss.
"State of Missouri
          v.
"George Woodward and Clifford Woodward.

"L. L. Collins, prosecuting attorney, within and for the county of Pemiscot and State of Missouri, upon his official oath informs the court, that George Woodward and Clifford Woodward, late of the county of Pemiscot and State of Missouri, on the 16th day of January, 1904, at the county of Pemiscot and State of Missouri, did then and there in and upon the body of one Ed. Pedigo, then and there being, unlawfully, wilfully, feloniously, premeditatedly, on purpose and of their malice aforethought make an assault, and with a certain dangerous and deadly weapon, to-wit, a club,

which said club was then and there of the length of four feet, of the breadth of two inches and of the weight of ten pounds and which said club they, the said George Woodward and Clifford Woodward, then and there in their hands had and held, they, the said George Woodward and Clifford Woodward, did then and there unlawfully, wilfully, feloniously, premeditatedly, on purpose and of their malice aforethought strike and beat him, the said Ed. Pedigo at and upon the right side of the head of him the said Ed. Pedigo, with the club aforesaid, and inflicting on and giving to him, the said Ed. Pedigo, in and upon the right side of the head of him, the said Ed. Pedigo, one mortal wound, which said mortal wound was of the length of four inches and of the breadth of two inches, of which said mortal wound the said Ed. Pedigo from the said 16th day of January, 1904, the year aforesaid, in the county aforesaid, until the 18th day of January, in the year aforesaid, in the county aforesaid, did languish, and languishing did live, on which said 18th day of January in the year aforesaid, the said Ed. Pedigo, in the county and State aforesaid, of the mortal wound aforesaid, died; and so L. L. Collins, prosecuting attorney as aforesaid, upon his official oath as aforesaid, doth say that they, the said George Woodward and Clifford Woodward, him, the said Ed. Pedigo, in the manner and by the means aforesaid, wilfully, unlawfully, feloniously, premeditatedly, on purpose and of their malice aforethought did kill and murder, against the peace and dignity of the State.

"L. L. Collins,

"Prosecuting Attorney.

"L. L. Collins, prosecuting attorney, within and for Pemiscot county, Missouri, being duly sworn upon his oath says that the facts stated in the above and foregoing information are true according to his best knowledge, information and belief.

"L. L. Collins.

"Subscribed and sworn to before me this 19th day of January, 1904.    (L. S.)

"J. W. GREEN,
"Clerk of the Circuit Court.
"HARVEY E. AVERILL, D. C."

Upon the trial the State's evidence tended to show that deceased was the proprietor of a pool hall, on one side of which he had a lunch counter. This pool hall was situated in the rear of George Myrick's saloon in the town of Steele, in Pemiscot county; and between the saloon and the pool room was a small room called the "stove room." In the rear and to the side of the pool room was a small back yard, known as the bull pen. There was evidence to the effect that deceased and defendant had trouble on two former occasions, once at another pool room in Steele, and once when defendant and the Moore boy were about to have a fight during a charivari. When deceased prevented this fight, the defendant threatened deceased; this was some two weeks before the final difficulty. Deceased was sitting in the stove room about seven o'clock on the night of the difficulty, talking to some one, when defendant came into the saloon. There was evidence to show that one, perhaps both of them, had been drinking some, but neither one was intoxicated. As he came in the front door, defendant said to Charles Johnson, the bartender, "Is there any God-damn-son-of-bitch in here that wants to fight?" To this remark, the bartender replied that he did not see any son-of-a-bitch in there, that he might go into the back room. Defendant walked straight into the stove room, where he at once engaged in a controversy with deceased about some games of pool that deceased said he had played and had not paid for; deceased asked him not to play any more till he had paid what he owed. Defendant said that he was going to play anyhow, and started into the pool room. A short time prior to this deceased and de-

fendant's brother, George Woodward, had some trouble
in the pool room over some eggs that George had or-
dered, but refused to pay for. About the time defend-
ant came into the pool room, George Woodward again
appeared, but no one seem to know which way he came
from. Defendant and deceased caught hold of each
other and began pushing, when defendant exclaimed,
"If you don't turn me loose, I will kill you." One wit-
ness testified that defendant said that he would not
fight Pedigo (deceased) in his own house, but that he
could whip any son-of-a-bitch in there. After a mild
fight in the pool room, both combatants went out the side
door into the bull pen, George Woodward going out with
them. As soon as the ground was reached, defendant
ran up against deceased, and deceased pushed him
back. George Woodward then ran up and struck at de-
ceased twice, hitting him once on the neck or shoulder.
Defendant was then heard to say, "I will kill the God-
damn-son-of-a-bitch." Defendant then picked up a
club and dealt deceased a heavy blow on the side of the
head; the lick was heard by persons in the pool room
and in the saloon. Although deceased had his hand in
his pocket at the time he was struck, no weapon was
found on his person, nor on the ground near him. The
only pistol that deceased ever had was one that he had
borrowed from defendant some days before, and it was
found in a small box behind the lunch counter after
this trouble. Defendant hurriedly left the scene of the
difficulty, and made his escape that night; but in pass-
ing an acquaintance on the road he said that he had
killed a God-damn-son-of-a-bitch, but that he had to do
it. Deputy sheriff Green testified that he hunted for
defendant a month or two before he found him; that
defendant finally came to town and gave bond. The
evidence further tended to show that the deceased en-
joyed a good reputation as a law-abiding man, but
that the reputation of defendant and his brother
George was bad. From the effects of this blow on the

head, deceased soon became unconscious; he lingered from Saturday night till Monday morning, when he died.

On behalf of the defendant, the evidence tended to show that he was nineteen years old, and deceased thirty-one; and there was considerable difference in their weight. That he and deceased were good friends, and only had one difficulty, and that was some two weeks before at a charivari, when deceased interfered and prevented defendant from fighting a son of M. Moore. That defendant had loaned his pistol to deceased some days before, and saw deceased with his pistol in his hand about one hour before the difficulty, when deceased was aiding the town marshal in taking two drunken men to the city jail. That when defendant came into the saloon, he walked straight to the stove-room, where he met deceased and said, "Ain't we having a good time to-night, Ed?" That he referred to the fact that deceased had recently assisted in arresting two disorderly men. That deceased replied, "I don't want you to talk to me." Defendant asked why, and deceased said he had done him harm and that he was going to whip defendant. With that deceased took hold of defendant by the breast and shoved him back into the pool room. Defendant then said, "No use to whip me in here in your own house, you got all the advantage, you are a big man, I am nothing but a boy." To which deceased replied, "That don't matter a damn, I am man enough to whip you, and I am going to do it; we will go out to the bull pen, there neither one of us has the advantage of the law." With that, deceased took defendant by the arm, shoved defendant out and shut the door behind. Outside, deceased began cursing defendant and striking him, when defendant said, "Ed, you are mad." To which deceased replied, "Yes, by God, I am mad." After striking defendant on the neck and knocking him off of the plank walk twice, George Woodward made a lick or two at deceased.

Defendant then raised up and struck deceased on the head with a club. M. Moore was outside and trying to separate the parties; and George Woodward had insisted that there was no use having any trouble, as they were all good friends; but that deceased said, "I can whip both of you God-damn-sons-of-bitches." At the time of striking, defendant said that deceased had his right hand in his pocket. The father and mother of defendant testified to seeing a bruised place on his neck a little after the difficulty that night.

At the close of the evidence the court instructed the jury upon murder of the second and manslaughter of the fourth degrees, upon reasonable doubt and self-defense. The complaints of appellant as to instructions will be given attention in the course of the opinion. The cause was submitted to the jury and they returned a verdict of guilty of murder of the second degree, assessing defendant's punishment at imprisonment in the penitentiary for a term of ten years. Judgment of sentence in accordance with the verdict was entered of record. Defendant's motions for new trial and in arrest of judgment being overruled, he in due time and form prosecuted his appeal to this court, and the record is now before us for review.

### OPINION.

Numerous errors are assigned as a basis for the reversal of this judgment. We will give the complaints of appellant such consideration as their importance and the administration of justice demand. The most vital proposition with which we are confronted in this cause is the challenge made by the appellant to the sufficiency of the information charging the offense of which the defendant was convicted. It is fundamental that the pleading in a criminal case, charging murder, must charge that the homicidal act itself was done feloniously. In other words, that the mortal wound inflicted must be charged to have been feloniously done,

191 Sup—40

that is, the fatal stroke must be either expressly charg-
ed as being done feloniously, premeditatedly, etc., or
the assault must be so charged and the technical words
following the term deliberately and malice afore-
thought, used in charging the assault, must be connect-
ed with the charge of the fatal stroke or wounding, by
the words "then and there" or equivalent terms.   In
State v. Feaster, 25 Mo. 324, the indictment was based
upon a section of the statute of 1845, which provided:
"If any person shall be maimed, wounded, or disfig-
ured, or receive great bodily harm, or his life be endan-
gered by the act, procurement or culpable negligence
of another, in cases and under circumstances which
would constitute murder or manslaughter  if death had
ensued, the person by whose act, procurement or neg-
ligence such injury or danger of life shall be occasioned,
shall, in cases not otherwise provided for, be punished,"
etc. The charge in that case was that "Elbert Feaster,
with force and arms, did then and there feloniously
make an assault on the body of one Carrol Harper with
a large stick, of the length of four feet, and the thickness
of four inches, which stick he, the said Elbert Feaster,
then and there held in both his hands, and with the
stick aforesaid did then and there inflict on the body
of the said Carrol Harper great bodily harm, under
such circumstances which would have constituted man-
slaughter if death had ensued, contrary," etc.   It will
be observed in that indictment that the pleader failed
to charge that the infliction of the great bodily harm
was done feloniously.   Judge RYLAND, speaking for
this court, whose views were  concurred in by Judge
Scott, said: "The offense under this section is liable
to the punishment of imprisonment in the penitentiary,
and consequently under our law is a felony; for all of-
fenses whose punishment may be by confinement in the
State penitentiary are declared by the statute to be
felonious.   The offense under this section is not the
assault; it is the great bodily harm inflicted.   Now it

is the well-settled law that in indictments for felonies the act charged, which constitutes the offense, must be alleged to have been done feloniously. In this indict- ment now under consideration the pleader has omitted to charge that the act done which makes the offense was done feloniously, and it is not enough to aver that the assault was made feloniously. This is a fatal ob- jection.'' In State v. Herrell, 97 Mo. 105, defendant Herrell was thus charged in the indictment with mur- der: ''Did, on or about the seventh day of October, A. D., 1884, at said county of Taney, and State afore- said, in and upon one Amos Ring, then and there be- ing unlawfully, wilfully, feloniously, deliberately, pre- meditatedly, on purpose, and of his malice afore- thought, make an assault, and with a certain pistol commonly called a revolver, then and there being load- ed and charged with gunpowder and leaden bullets, and which said pistol was then and there held in the right hand of him, the said Newton W. Herrell, at, to and against, and in and upon him, the said Amos Ring, did unlawfully, wilfully, feloniously, deliberately, pre- meditatedly, on purpose, and of his malice afore- thought, shoot off and discharge, and by means and force of the gunpowder and leaden balls aforesaid, did give to him, the said Amos Ring, two wounds, which said wounds were then and there mortal wounds, one of said wounds being on the left side of the body of him, the said Amos Ring, near the fifth rib, penetrat- ing and entering the body of him, the said Amos Ring, near said fifth rib, said wound being of the depth of six inches, and width of one-half inch, and the other said mortal wound being on the top of the head of him, the said Amos Ring, and said wound being then and there a mortal wound, being in depth about six inches, and width of one-half inch, of which said mortal wounds, he, the said Amos Ring, did then and there, on said seventh day of October, 1884, at the county of Taney and State of Missouri, instantly die. And so

the grand jurors, aforesaid, do say that the said New-
ton Herrell, the said Amos Ring, in manner and form,
and by the means aforesaid, feloniously, deliberately,
premeditatedly, on purpose and of his malice afore-
thought, did kill and murder, against the peace and
dignity of the State of Missouri.'' It will be observed
in that indictment that all of the technical words were
used in charging the assault, then followed the charge
that ''by the means and force of the gunpowder and
leaden balls aforesaid, did give to him, the said Amos
Ring, two wounds, which said wounds were then and
there mortal wounds,'' etc., yet this indictment was
held insufficient, on the ground that it failed to charge
that the infliction of the mortal wound was felonious.
SHERWOOD, J., speaking for this court, said of this
indictment: ''The indictment was insufficient in that
it failed to charge that the homicidal act *itself* was
done *feloniously*, etc. The failure thus to charge was
not supplied by the allegation that the assault was
made feloniously, nor by the concluding words of the
indictment, nor by anything else therein contained.
This position is abundantly sustained by authority.''

In State v. Green, 111 Mo. 585, this court had in
judgment the sufficiency of the indictment in that cause
for murder, and in discussing the essential requisites
of an indictment for so grave an offense, GANTT, J.,
speaking for the court, said: ''This court in State v.
Blan, 69 Mo. 317, held that it was not the purpose or
design of our statute of jeofails to change our entire
system of criminal practice, and said 'the ancient
forms of proceeding have been retained with specific
modifications.' It is still necessary to allege every
substantive fact which the State must prove, in order
that the defendant may know 'the nature and cause of
the accusation' against him. Measured by all the ap-
proved precedents, this indictment is insufficient, in
that it fails to aver, after alleging that the defendant
shot and discharged the pistol at Beaumont, '*that,*

*with the bullet so shot out of the said pistol, the de-*
*fendant, then and there feloniously, wilfully, deliber-*
*ately, premeditatedly, and of his malice aforethought*
*did strike, penetrate and wound the said Joseph Beau-*
*mont, in and upon the head of him the said Beaumont,'*
*etc."*

In the recent case of State v. Williams, 184 Mo.
261, the cases herein referred to were all cited ap-
provingly, and it was said in that case, in treating of
the essential feature of an indictment for murder, that,
"In all cases where the common law prevails it has
always been held necessary to allege the striking or
wounding to have been done feloniously, premeditat-
edly and of malice aforethought. It is not necessary
to repeat those words immediately before the charge
of striking or wounding where the technical words
feloniously, premeditatedly, deliberately and of malice
aforethought have been used in charging the assault
and the words 'then and there' connect these words
with the charge of the fatal stroke or wounding, for in
such cases the words feloniously, etc., will run through
the subsequent allegations and thus connect them with
the mortal stroke to which they are essential. [State
v. Herrell, 97 Mo. 108 and 109.] But where, as in this
case, the words 'then and there' are omitted, it has
been held the indictment is bad. [State v. Feaster,
25 Mo. 324; State v. Herrell, 97 Mo. 105.] And so in
State v. Arnewine, 126 Mo. 567, the charge was, 'did
make an assault, and with a certain pistol, commonly
called a revolver, loaded and charged with gunpowder
and leaden balls, which he, the said William Arnewine,
then and there wilfully, feloniously, deliberately, pre-
meditatedly, on purpose, and of his malice afore-
thought, did shoot and discharge at, to, against, in and
upon the body of him, the said George Keeton, giving
to him, the said George Keeton, then and there, with
the pistol loaded and charged, had and held, shot off
and discharged as aforesaid, in and upon the left side

of the abdomen, him, the said George Keeton, one mortal wound,' etc. It was held sufficient as the technical words described the shooting and the wounding, but in that case the indictment was barely held good and by no means approved as good pleading.'' In State v. Johnson, *ante*, 177, the rules of criminal pleading as announced in the case of State v. Williams were unqualifiedly approved.

Measured by the rules of pleading in criminal cases, as well as by all the approved precedents, the information in this cause now in judgment before us must be held insufficient, in that it fails to allege that the homicidal act, the fatal stroke, was done feloniously, wilfully, deliberately, premeditatedly, and of his malice aforethought; nor is the wounding in any way connected with the previous allegations of those essential terms in charging the assault, by the use of the words ''then and there'' or equivalent terms. The charge in this information may thus be briefly stated: ''That the defendant unlawfully, wilfully, feloniously, premeditatedly, on purpose and of his malice aforethought, did strike and beat him, the said Ed. Pedigo, at and upon the right side of the head of him, the said Ed. Pedigo, with the club aforesaid, and inflicting and giving to him, the said Ed. Pedigo, in and on the right side of the head of him, the said Ed. Pedigo, one mortal wound,'' etc. We might stop here to inquire with what instrument was the mortal wound given. It correctly charges the manner of the assault by striking and beating the said Ed. Pedigo at and upon the right side of his head with the club aforesaid; then follows the charge connected by the conjunction ''and'' inflicting and giving to said Pedigo one mortal wound.

It is left to conjecture under the form of this charge, whether the mortal wound was inflicted and given by the club, or whether, in addition to beating and striking him with the club aforesaid, he also, by some other means, inflicted and gave the mortal wound.

If we were permitted to indulge in presumptions, it might be said that the infliction and giving of the mortal wound charged in this information was the result of the use of the club in the manner alleged, but under the well-settled rules of law in respect to pleading in criminal cases, this cannot be done. It is apparent that this information does not charge the infliction or giving of the wound with the club with which the assault is charged to have been made; it simply charges two separate and distinct acts, that is, an assault and the manner of making it and the infliction of wounds; there is an entire absence of any allegations, following the charge of the manner of making the assault, that "then and there with the club aforesaid, and by the means aforesaid, inflicted and gave to the deceased the mortal wounds," etc. "In an indictment or information nothing material shall be taken by intendment or implication." [2 Hawk. P. C., chap. 25, p. 324; State v. Meyers, 99 Mo. 107.] As was said in State v. Green, supra, "An indictment or information for murder under our practice must contain all the essential averments that were required at common law. Our statute of jeofails has not dispensed with any of the material averments which were necessary at common law." In 3 Chitty's Criminal Law, star pages 752, 753 and 754, it is laid down that it is always necessary in charging a murder by shooting to use the words "did strike and wound" and that "the striking and wounding was done feloniously, wilfully, premeditatedly, and with malice aforethought." Had this information, after charging the beating and striking of the deceased with the club as charged, simply added, "then and there, with the club aforesaid, in the manner and by the means aforesaid, did wilfully, feloniously, premeditatedly, and of his malice aforethought, give to the deceased certain mortal wounds," etc., it would find support in all of the well-considered cases by this court, but in its present form it has no precedent, either in the text-books or

adjudicated cases, upon which to rest its sufficiency.

The conclusion reached upon this question as to the sufficiency of the information, renders it unnecessary to discuss at length the other assignment of errors on the part of the appellant. As this case must be retried in the event of the filing of a proper information, it is not inappropriate to at least briefly indicate our views upon some of the questions presented.

Counsel for appellant insist that the court erred in refusing to sustain appellant's objection to leading questions propounded to the witness Arthur Curry. It is sufficient to say of this complaint that the propounding of leading questions in the manner of examining witnesses is always a matter within the sound discretion of the trial court. In the trial of causes it frequently occurs that one side or the other must introduce unwilling or unfriendly witnesses, and in the examination of such witnesses the court in the exercise of a proper discretion may permit the asking of leading questions and thereby commit no error. [State v. Napper, 141 Mo. 401.]

It is insisted that the court erred in permitting the State to prove the good reputation of the deceased. This testimony under the rules of evidence could only be admissible to rebut testimony elicited by the appellant affecting the reputation of the deceased. Unless the reputation of the deceased was put in issue by the appellant, then this testimony was clearly inadmissible. The record in this cause discloses that the defendant, upon cross-examination of witness Charles Johnson, for the State, did undertake to elicit testimony which reflected upon the good reputation of the deceased. Defendant having opened up the subject of the good reputation of the deceased, it was not error to permit the State to rebut any testimony offered by the defendant upon that subject. However, upon a retrial of this cause, unless the reputation of the de-

ceased is put in issue, the court should exclude any evidence as to his general reputation.

The record discloses some testimony of conversations and acts between George, the brother of the defendant, and one of the witnesses, in respect to cooking some eggs, in the restaurant of deceased, in the absence of the defendant. We are of the opinion that this testimony should be excluded. We are unable to see how it tends to prove or disprove any of the issues presented by the information against the defendant on trial. It is urged by appellant that the admission of testimony tending to show that a brother of the defendant, George, who is jointly indicted with him, had an open knife during the fatal difficulty, and that a Mr. Moore, who was present at the difficulty, was cut on the knuckle. It will suffice to say upon this contention that everything occurring contemporaneously with the main difficulty was a part of the *res gestae,* and there was no error in the admission of such evidence.

It is also insisted that the court erred in the admission of testimony as to the general reputation of the defendant and his brother George for morality, and also in the admission of testimony tending to show that defendant had previously been convicted of a criminal offense before a justice of the peace. It was ruled by this court in State v. May, 142 Mo. l. c. 150, that the defendants having offered themselves as witnesses, it was competent under our rulings to attack their general moral character. [State v. Grant, 79 Mo. 113, and cases cited.] A similar ruling was made in State v. Evans, 158 Mo. l. c. 609. As to the evidence of prior convictions of criminal offenses, defendant having testified in his own behalf, it was competent to show that fact in a legitimate way, in order to affect his credibility; however, it should be shown by competent evidence. If the prior convictions were denied by the defendant, the record of the justice of the peace, or the court wherein such convictions were had, should

be identified, and introduced in evidence. It should not be left to any witness to merely say that he had been convicted. [State v. Blitz, 171 Mo. 530; State v. Thornhill, 174 Mo. 364; State v. Spivey, 191 Mo. 87.]

There is also some complaint in respect to the hypothetical questions propounded to Dr. Conrad. It is sufficient to say that the rules of law in relation to hypothetical questions are well settled, and as this case is to be retried, we indulge the presumption that the trial court will have such question conform to the well-settled rules of evidence upon that subject.

Complaint is also urged that the court improperly instructed the jury. It is sufficient to say of this complaint of error that it is without merit. The instruction upon murder of the second degree required the jury to find every essential element of that offense, and adding to the instruction, "without deliberation," did not render it objectionable; however, if the court, upon another trial, should use the terms in the instruction, "without deliberation," it would be appropriate to properly define "deliberation." Instructing the jury that defendant had the right to defend himself or his brother, did not constitute error. We are unable to conceive, if defendant was justified, how the mere fact of extending his right of self-defense to that of his brother, could in any way prejudice his rights. If there is no testimony tending to show that he was acting in defense of both himself and his brother, then the instruction should not be given. Voluntary drunkenness furnishes no excuse or justification for the commission of crime, and if there is testimony upon that subject, it is not error for the court to so declare the law.

The record in this cause is similar to the one in the case of State v. Spivey, supra, abounding with complaints on part of appellant of the action and conduct of the prosecuting attorney during the progress of the trial of this cause. This case doubtless will be retried,

and we deem it unnecessary to burden this opinion with a reproduction of what was said in the Spivey case. While it is the duty of the prosecuting officer to diligently and earnestly prosecute all offenders charged with the commission of crime, it is equally consistent with his duty to confine himself within the record, and the trial court should insist and see to it that such insistence is heeded, that no remarks, either in the opening of the cause or during its progress, be made by the prosecuting attorney which in any way would endanger a calm and dispassionate consideration of the evidence by the jury.

We have thus given expression to our views upon the record before us, which results in the conclusion that the judgment should be reversed and the cause remanded in order that a new information or indictment may be preferred and a trial had in accordance with the provisions of law.

All concur.